

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
03/13/2017

| | | |
|---|---|---|
| IN RE: | § | |
| RAFAEL SEPULVEDA PEREZ JR | § | |
| PATTY PEREZ | § | |
| DEBTOR(S) | § | CASE NO.  14-32266-H5 |
| | § | |
| MARICHU PASAGUI | § | |
| | § | |
| PLAINTIFF(S) | § | ADVERSARY NO.  14-3272 |
| | § | |
| VS. | § | |
| RAFAEL SEPULVEDA PEREZ JR | § | |
| PATTY PEREZ | § | |
| | § | |
| DEFENDANT(S) | § | |

## ORDER

Before the Court is the Second Amended Complaint of Plaintiff Marichu Pasagui to determine the dischargeability of the debt owed by Debtors.  This Court has jurisdiction over this proceeding pursuant to 28 U.S.C.§§ 1334 and 157(b). This is a core proceeding.

This dispute involves three parties: Plaintiff Marichu Pasagui, Debtor Patty Perez, and Debtor Rafael Perez, who for ten years jointly owned and

Perez 20170302.wpd

operated a company that provided janitorial services to businesses. Initially, the company was called Mexfil, Inc. (Mexfil). In October 2006 the name was changed to Mexfil Hotel & Building Services, Inc. (Mexfil Services). (Defendant's Exhibit 114). The dispute between the parties involves two transactions, one in April 2008, and one in September 2008.

Debtors filed Chapter 7 bankruptcy on April 25, 2014. On August 4, 2014, Plaintiff filed this adversary proceeding, seeking denial of discharge of Debtors' debt to Plaintiff.[1]

In 2011 Plaintiff sued Debtors in state court for common law fraud against both herself and the company. The jury rendered a verdict in Plaintiff's favor of $1,435,185.89. In addition to collateral estoppel, Plaintiff's Second Amended Complaint alleges Debtors' actions related to Mexfil Services, their jointly owned company, violated 11 U.S.C. § 523(a)(2)(A) (fraud), 11 U.S.C. § 523(a)(4) (breach of fiduciary duty), and

---

[1]Plaintiff mistakenly filed the adversary complaint in the main bankruptcy case on August 4 and refiled it properly on August 8, 2014, which was beyond the deadline under Rule 4007. Plaintiff failed to issue summons until December 19, 2014. Debtors urge that plaintiff's complaint should be dismissed for its tardy timing and its delayed prosecution of the adversary. The Court will address this issue infra.

11 U.S.C. § 523(a)(6) (willful and malicious injury).[2]

Debtors deny the state court judgment estops their right to litigate this case. Debtors answer that they did not act with intent to defraud Plaintiff and they reasonably relied on the advice of corporate counsel for the actions about which Plaintiff complains. Debtors seek dismissal on grounds the complaint is untimely.

After trial of this adversary proceeding, the Court finds that Plaintiff has failed to bear her burden to prove Debtors committed fraud or willful and malicious injury. The Court grants Debtors' discharges of the debt to Plaintiff for the following reasons:

## I. **Mexfil Services History**

### a. **Early years of the company**

Plaintiff Pasagui and Debtor Patty Perez (f/k/a Patty Martinez) were friends who worked together at ABS, Associated Building Services, a company that supplied janitorial services to businesses. Plaintiff is some

---

[2]Plaintiff withdrew the breach of fiduciary duty allegation at the close of the first day of trial. *See Trial Tr., 9/8/2016, p. 118.*

years older than Patty Perez and initially regarded Patty as a daughter and Patty's children as grandchildren. *(Trial Tr., 9/8/2016, p. 68.)*

In 2001, the two decided to start their own business to offer the same services as ABS. While Plaintiff was no longer employed by ABS, Patty continued to work there. Consequently, they agreed that their business would be in Plaintiff's name with an equal share reserved for Patty.

In August 2002, Syd Phillips, an attorney previously known to Plaintiff, incorporated the business called Mexfil, Inc. The Articles of Incorporation show Plaintiff as the sole director. Mexfil was authorized to issue one million shares with a par value of $1.00. (Defendant's Exhibit 111).

After incorporation, Phillips referred Plaintiff to Chris Iverson, as an attorney who did corporate legal work more frequently than did Phillips. Plaintiff hired Iverson to represent Mexfil. Iverson drafted the minutes of the organizational meeting.

Those minutes, dated August 22, 2002, show Plaintiff as President/ Secretary and Rafael Perez as Vice President/Treasurer. Both officers are

authorized to sign checks on behalf of the company. Both officers approved the first corporate minutes, signing as Directors of the company. Of the one million authorized shares, Mexfil issued only three thousand, one thousand to Plaintiff and two thousand to Rafael Perez.[3] All parties agreed that Rafael held one thousand shares on behalf of Patty. (Defendant's Exhibit 112).[4]

No one disputes that in the early years of Mexfil Plaintiff did more work on behalf of the company than did Patty Perez. At first the business operated from Plaintiff's home. Plaintiff was responsible for obtaining several large commercial accounts and for supervision of the work staff. At the same time, at night, Patty Perez worked for Mexfil, pricing proposed job orders.

Mrs. Perez formally left ABS the end of 2006. On the first working day in January 2007, she was employed full time at Mexfil Services. Because the company's janitorial business had grown too large to continue

---

[3]No more shares were ever issued by Mexfil, or Mexfil Services.

[4]Sometime in 2002 Patty Martinez married Rafael Perez.

at its then-leased premises, Mrs. Perez purchased a 4,000 sq ft building on Dunvale Street in Houston. Thereafter, the building was  leased to Mexfil Services. Plaintiff signed the five year lease on behalf of the company. (Defendant's Exhibit 12).

In 2006, Patty Perez began to loan monies to Mexfil Services. On November 15, 2006, Patty applied for a $45,000 line of credit from Bank of America, in her own name. This loan was to be used on behalf of the company. (Defendant's Exhibit  6). Also, in November 2006, Patty paid $10,000 to Mexfil Services for operating expenses. (Defendant's Exhibit 6, p. 15).  At the same time, she obtained a cashiers check made out to Mexfil Services from her Chase bank account, in the amount of $20,000. (Defendant's Exhibit 6, p. 16). Mexfil Services executed a promissory note payable to Patty, in the amount of $30,000, dated January 1, 2007. (Plaintiff's Exhibit 2). The Mexfil Services balance sheet dated December 31, 2006, lists an account payable to Patty Martinez of $67,856.15. (Defendant's Exhibit  32, p. 21).

Also on January 1, 2007, Plaintiff, as president, signed a promissory

note, in the amount of $46,350.00, to reflect Mexfil Services' obligation to repay Patty Perez for the monies borrowed on the Bank of America line of credit, plus a $1,350 transaction fee charged by the bank. The repayment terms were monthly payments of $991, beginning in January 2007. (Defendant's Exhibit 2).

In March 2007, Plaintiff signed a $30,000 "Debt Acknowledgement" (back dated to January 1, 2007), as President of Mexfil Services, acknowledging that in 2002 Patty Perez gave the company certain equipment and assets. This promissory note recites that in return for collection forbearance, the company will repay its debt of $30,000 to Patty Perez in a lump sum on resale of substantially all the assets of the company. (Defendant's Exhibit 1).

On April 6, 2007, Plaintiff, Patty, and Rafael executed the original Trusteed Buy-Sell Agreement. (Plaintiff's Exhibit 8).   This original agreement required Plaintiff, Patty, and Rafael to endorse their share certificates in Mexfil Services and to transfer custody of those share certificates to Iverson.      Iverson testified that he intended that corporate

structure to create an exit strategy if one of the parties died or became disabled. He testified that the purpose of arranging for himself to be trustee was to enable him to purchase three key-person insurance policies rather than requiring each of the owners to purchase key-person insurance policies covering the other two owners. (Trial Tr., 9/9/2016, p. 11-12).

In June 2007, Plaintiff, as President of Mexfil Services, applied for a Small Business Administration loan of $50,000 for "expansion of the business" on behalf of Mexfil Services from Innovative Bank. (Defendant's Exhibit 49). Instead of $50,000, the bank only approved $15,000. At trial Plaintiff testified $15,000 was not sufficient for the company's needs. Plaintiff then asked Patty if Plaintiff herself could borrow that money from the company, and Patty agreed.[5] Plaintiff took the $15,000 for her personal use. (Trial Tr., 9/8/2016, p. 84). There is no evidence Plaintiff repaid this loan to Mexfil Services.

The Mexfil Services Balance Sheet dated June 11, 2007 continued to show an account payable of $63,933.12 owed by the company to Patty

---

[5]

Perez, an amount slightly reduced from the amount previously shown on the December 31, 2006 Balance Sheet. (Defendant's Exhibit 32, p. 20).

In February 2008 Patty Perez wrote a check payable to Mexfil Services, drawn on her own Bank of America account, in the amount of $44,000, and deposited it to the company's bank account. (Defendant's Exhibit 6, p.19) At the same time, Patty Perez gave Mexfil Services two cashier's checks for $20,000, each drawn on her Chase account. (Defendant's Exhibit 6, p. 10, 16).

On February 15, 2008, Mexfil Services' new president, Karl Bumiller, signed a promissory note on behalf of the company, in the amount of $30,000, payable to Patty Perez. By its terms, the note accrued 0% interest if repaid by May 1, 2009. If not repaid by that date, Mexfil Services would begin repayment at $600.18 per month for five years. (Defendant's Exhibit 4).

### b. The first alleged fraudulent transfer

In February 2008, Patty Perez told Chris Iverson that she wanted to "get my money back." (Trial Tr., 9/8/2016, p. 135). Plaintiff and the

Perez 20170302.wpd                    -9-

Perezes met in Chris Iverson's office. This is the first meeting in which the shareholders met with Iverson to discuss a solution to Patty Perez's concerns about repayment of her loans.

In April 2008, Patty Perez obtained a line of credit from JPMorgan Chase, and deposited $50,000 into Mexfil Services' account. (Defendant's Exhibit 6, p. 18). In the same month, Plaintiff and Patty Perez met for a second time with Chris Iverson. This meeting was again about finding a procedure for repayment of the loans Patty had made to the company. Iverson showed them his solution to the problem of assuring that Patty would get her money back.

The solution Iverson proposed consisted of two agreements.  In the first agreement, titled "Agreement to Transfer and Option to Repurchase Shares of Mexfil Services and Building Services, Inc.," Plaintiff agreed to sell Patty Perez two hundred and seventy one (271) of Plaintiff's one thousand shares (1,000). According to the agreement, Plaintiff could within three years repurchase these shares for $81,257.00.  If not exercised, that option to repurchase would expire. Plaintiff (seller) acknowledged that

Patty Perez (purchaser) "has borrowed funds from one or more third party lenders to fund capital contribution for Seller and Purchaser has incurred and is incurring interest expense at a rate from thirteen per cent (13%) to nineteen and 99/100 per cent (19.99%). " (Defendant's Exhibit 8, p. 2). Plaintiff and Patty Perez signed this agreement on April 29, 2008. (Defendant's Exhibit 8).

The same day, Plaintiff, along with Rafael and Patty Perez, and Chris Iverson, acting as trustee, signed the second agreement, the "Amendment to Trusteed Buy-Sell Agreement for Mexfil Services and Building Services, Inc." This agreement showed the reallocation of the 3,000 issued shares of the company after the stock transfer. As a consequence, Patty Perez is shown as owning 1,542 shares (51%), Rafael Perez and Plaintiff are shown as owning 729 shares each. (Defendant's Exhibit 9).

### c. The second alleged fraudulent transfer of Plaintiff's stock

On July 22, 2008, Chris Iverson had the three shareholders sign a

document entitled Shareholders' Agreement. (Defendant's Exhibit 10).[6] This document "sets out certain rights and responsibilities of the Shareholders of the corporation as they relate to funding the capital needs of the corporation. The shareholders agree that when the corporation needs "an infusion of cash," they will provide those funds. Any shareholder who was unable or unwilling to provide such funds, agreed that he or she would transfer some of their shares to the contributing shareholder. (*Id.*, at 1). At trial Chris Iverson described this document as serving to transfer shares and create an option to repurchase them. He explained that he drafted the document at the request of the shareholders to provide some comfort to Patty Perez. (Trial Tr., 9/9/2016, p. 14).

In Fall 2008, Mexfil Services continued to have serious needs for cash. (Trial Tr., 9/8/2016, p. 139). George Gonzales, the comptroller of Mexfil Services, approached Wells Fargo Bank in an effort to obtain a further line of credit. Brad Lefevre was employed by the bank as the lead

---

[6]Patty Perez signed as vice president of Mexfil Services and as shareholder.

person in dealing with the company.[7] Lefevre explained that the bank required the personal guarantee of all shareholders in order to make that line of credit available to Mexfil Services. He discovered that one of the three shareholders, Plaintiff Marachu Pasagui, who owned 20% of the stock, had unacceptable credit, and did not qualify as a guarantor of the loan. "If she did not give up her stock, without the ability to reacquire it, the loan could not be made." (Defendant's Exhibit 118).   Thereafter, Lefevre understood that Pasagui executed a stock transfer agreement with Mexfil Services. Thereafter, the loan was granted and  guaranteed by Rafael and Patty Perez. (*Id.*)

Iverson testified that Gonzales approached him to draw up a document transferring Plaintiff's remaining stock to Patty Perez. (Trial Tr., 9/9/2016, p. 19). Iverson knew that Mexfil Services was having cash flow problems. (*Id.*) From Gonzales, Iverson learned the company was trying to obtain a loan from Wells Fargo, but Plaintiff's bad credit prevented any

---

[7]At trial, the parties agreed to the admission of Lefevre's affidavit in place of his live testimony. (Defendant's Exhibit 118).

such loan. Consequently, Iverson was asked to draft an agreement to transfer Plaintiff's remaining shares to Patty Perez. Iverson testified he was surprised and asked that Plaintiff call him personally. (*Id.* at 20) Plaintiff telephoned Iverson immediately. She explained that she needed to transfer all her shares with no right to repurchase or the Wells Fargo loan would not go through. (*Id.* at 21). Iverson drafted two documents: (1) the Agreement to Transfer Shares of Mexfil Hotel and Building Services, Inc. which recognized the transfer of Plaintiff's 729 shares (Defendant's Exhibit 14); and (2) the Agreement to Transfers Shares of Mexfil Hotel and Building Services, Inc., which rescinded Plaintiff's right to repurchase her 271 shares previously transferred to Patty Perez in April 2008 (Defendant's Exhibit 11).

Iverson then drafted and sent both documents to Mexfil Services. Each document recited that the consideration for the transfer of 729 shares and for the rescission of Plaintiff's right to repurchase the 271 shares was that Patty Perez (Purchaser) *"has contributed or would contribute in the future* to the capital of the corporation on behalf of the Seller (Plaintiff)

Two Hundred Eighteen Thousand Seven hundred and 00/100 ($281,700)."

(*emphasis added*).   Both documents were signed by Plaintiff and Patty

Perez on September 11, 2008.

    At trial Plaintiff described this document:

> Q And bottom line is, on those agreements that Chris Iverson drafted up, if somebody was going to make a cash contribution to the company either you or Rafael or Patty, if you all were going to make a contribution to the company the language in Chris Iverson's document was, if you couldn't make that contribution, you ended up giving up stock to the person who could make that contribution.
>
> A Correct.
>
> Q And you and Patty and Rafael didn't come up with that language, did you?
>
> A No.
>
> Q Chris Iverson came up with that. And you guys were just signing off whatever he put forth, and agreeing to it because he's a lawyer, right?
>
> A Correct.

(Trial Tr., 9/8/2016, p. 91-92)

Notwithstanding Plaintiff's September 2008 transfer of her remaining 729 shares to Patty Perez, Plaintiff, Patty Perez, and Mexfil Services continued among themselves to treat Plaintiff as a shareholder. On Mexfil Services' 2008 tax return, the lines reflecting ownership interests of officers is blank. (Defendant's Exhibit 38). On Mexfil Services' 2009 tax return, the lines reflecting ownership list Plaintiff as holding 23.5% of the shares. (Defendant's Exhibit 39).[8]

In 2008, both the state taxing authorities and the IRS placed tax liens on Mexfil Services' bank accounts. The Internal Revenue Service concluded that Mexfil Services (including the time when it was known as Mexfil) had improperly reported its employees as independent agents, and failed to deduct and report Form 941 taxes for the employees.

At trial Plaintiff testified that she only knew about the IRS problems from what she was told.[9] However, on cross examination Plaintiff agreed

---

[8]Although the copy of the 2009 tax return in evidence is not signed, Patty Perez testified that she filed it. (Trial Tr., 9/8/2016, p. 150). This testimony is uncontradicted.

[9]Plaintiff's first amended state petition stated that the IRS imposed a lien on Plaintiff's home of $49,000 based on taxes due from Mexfil.

she had accompanied Rafael Perez to the IRS office "maybe twice." (Trial Tr., 9/8/2016, p. 99).

In addition, Plaintiff testified that her own salary checks and those of Patty and Rafael Perez were withheld by the company due to its poor cash flow. (Trial Tr., 9/8/2016, p.94) Plaintiff approached Karl Bumiller, the then president of Mexfil Services, to ask whether they could get paid. (*Id.*, at p. 94).[10]

In 2009 Mexfil Services hired a management consultant, IPA. IPA recommended a change to the executives' positions and a reduction in all executives' salaries. Thereafter, Plaintiff's salary was reduced from $90,000 a year to $50,000 a year. Plaintiff testified that the IPA representative, "Ismael," found her sleeping in her office and made a "big deal out of it." Plaintiff believes her salary was reduced in part because of this event. (Trial Tr., 9/8/2016, p.104).

In December 2009 Plaintiff and Rafael Perez signed a document

---

[10]Plaintiff's job at that time was to collect overdue receivables from Mexfil Services accounts. (Trial Tr., 9/82016, p. 96).

entitled "Notice Agreement." (Plaintiff's Exhibit 13).   Under this agreement, Plaintiff had the option either to reduce her salary to $51,000 and retain her shares, or to resign from the company and sell her shares back to the company. If she resigned, her shares would be appraised and sold back to the company for the appraised amount. This option would be available to Plaintiff until January 2010.  Before  the deadline, Plaintiff agreed to reduce her salary and retain her job and  her shares. (Defendant's Exhibit 56, p.2).

In January 2010, Plaintiff and Patty Perez, as vice president of Mexfil Services, signed the employment agreement contemplated under the December 2009 Notice Agreement. Pursuant to this employment agreement, Plaintiff could only be fired for cause.[11] (Defendant's Exhibit 57).

In October 2010, Plaintiff confronted Defendants, apparently believing that she was being "set up" to be fired.  (Trial Tr., 9/8/2016, p. 75).  She demanded to see Mexfil Services' records. Plaintiff testified Patty

_____

[11]

Perez 20170302.wpd                     -18-

Perez refused her access to the records, asserting that Plaintiff was not a shareholder. (Trial Tr., 9/8/2016, p. 75-76). At that point, Plaintiff called Iverson. Plaintiff testified that Iverson notified her that she was not a shareholder. (Trial Tr., 9/8/2016, p. 76).

Conversely, Iverson testified that, at that point, he did not know who was a shareholder. (Trial Tr., 9/9/2016, p. 27). He testified that he put the issue on the table for discussion. He testified that Plaintiff seemed to believe that Iverson was telling Plaintiff that she was not a shareholder, instead of asking him whether she was a shareholder. (Trial Tr., 9/9/2016, p. 28-29).

## II. Timeliness of Plaintiff's Original and Amended Complaints

Defendants argue Plaintiff's Original Complaint and Amended Complaint were not filed timely. Debtors filed case #14-32266-H5-7; *In re Rafael Sepulveda Perez, Jr. and Patty Perez,* in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. Debtors appeared for their initial creditor's meeting on June 5, 2014, which

was reset and concluded on June 19, 2014. Plaintiff filed her Original Complaint incorrectly in the main bankruptcy case on August 4, 2014, and then correctly initiated an adversary proceeding by re-filing her Original Complaint on August 8, 2014.

The time constraints applicable to objections to discharge are contained in the Bankruptcy Rules are prescribed by the United States Supreme Court for the "practice and procedure in cases under Title 11." *Kontrick v. Ryan*, 540 U.S. 443, 453 (2004). Pursuant to Federal Rule of Bankruptcy Procedure 4007(c), a complaint to determine the dischargeability of any debt pursuant to § 523(c) of the Code shall be filed not later than 60 days following the first date set for the meeting of creditors. Consequently, August 4, 2014 was Plaintiff's deadline to file a complaint objecting to Debtors' discharge. (Docket No. 11, Case 14-32266).

The Fifth Circuit notes that the "strict time limitation placed upon creditors who wish to object to a debt's dischargeability reflects the

Bankruptcy Code's goal of providing debtors with a fresh start." *In re Dunlap*, 217 F.3d 311 (5th Cir. 2000). The purpose of the time limitations is to allow informed decision making early in the proceedings and establish a bar date with certainty. *Id.*, *see also In Re Avalos*, 361 B.R. 129 (S.D. Tex. 2007).

This Court finds Plaintiff's Original Complaint was filed timely. Although counsel for Plaintiff inadvertently filed the Original Complaint in the main bankruptcy case rather than initiating a new adversary proceeding, the filing of the Original Complaint provided notice to Debtors that Plaintiff was preserving her rights and allowed the parties to make better-informed decisions early in the proceedings. *Neely v. Murchison*, 815 F.2d 345, 346-47 (5th Cir. 1987) (Rule 4007(c) "evince[s] a strong intent that the participants in bankruptcy proceedings be assured that, within the set period of 60 days, they can know which debts are subject to an exception to discharge."). Plaintiff's counsel's filing error was merely clerical and did not violate the established bar date. Debtors were already

on notice of the exception and received a copy of the complaint and exception to discharge timely on August 4, 2014.

Debtors further argue that Plaintiff's Amended Complaint was filed untimely. Plaintiff moved for leave to file her Second Amended Complaint on March 9, 2016. Debtors filed their response opposing leave to amend on April 11, 2016. The Court held a hearing on April 28, 2016, and granted leave to amend. The Court found Debtors would not be unduly prejudiced by Plaintiff's amendment adding a claim for breach of fiduciary duty under 11 U.S.C. §523(a)(4)(A).

### III. Standards for Objection to Dischargeability

Exceptions to discharge under §523 should be construed in favor of the debtor. *Fezler v. Davis (In re Davis),* 194 F.2d 570, 573 (5th Cir. 1999).

**a.   Fraud under 11 U.S.C. § 523(a)(2)(A)**

"Section 523(a)(2)(A) excepts from the discharge provisions of the Bankruptcy Code any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ...

Perez 20170302.wpd                -22-

false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." *RecoverEdge L.P. v. Pentecost,* 44 F.3d 1284, 1292 (5th Cir. 1995). "As a general matter, §523(a)(2)(A) contemplates frauds involving moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality, is insufficient." *Id.* (quoting *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992). "In order for a debtor's representation to be a false representation or false pretense under § 523(a)(2), it must have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party." *Id.*

"Actual fraud has two parts: actual and fraud. The word actual has a simple meaning in the context of common-law fraud: It denotes any fraud that involv[es] moral turpitude or intentional wrong." *Husky Int'l Elecs., Inc. v. Ritz,* 136 S. Ct. 1581, 1586 (2016). "Actual fraud stands in contrast to implied fraud or fraud in law, which describe acts of deception that may

exist without the imputation of bad faith or immorality." *Id.*

Moreover, a court may infer an intent to deceive from a "reckless disregard for the truth or falsity of a statement, combined with the sheer magnitude of the resultant misrepresentation." *In re Norris,* 70 F.3d 27, 30 n.12 (5th Cir. 1995), *citing In re Miller,* 39 F.3d 301, 305 (11th Cir. 1994). In *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992) the Fifth Circuit noted "[w]here the speaker has an unreasonable but honest belief that a representation is true and has information justifying that it is, he does not have an intent to deceive, i.e., "a 'dumb' but honest" defendant does not have scienter. *Id., citing Palmacci v. Umpierrez,* 121 F.3d 781, 788 (1st Cir. 1997).

"The failure to disclose a material fact when one has a duty to do so is sufficient grounds for nondischargeability for fraud under § 523(a)(2)(A) of the Bankruptcy Code." *In re Abraham,* 2014 WL 3406513,16 (USDC SDTx 2014), citing *In re Demarest*, 176 BR 917, 920 (Bankr. W.D. Wash. 1996, aff'd 124 F.3d 211 (9th Cir. 1997). Whether there is a duty to

disclose is a question of law for the Court. *In re Int'l Profit Assocs., Inc.* 274 S.W.3d 672,678 (Tex. 2009).

The Fifth Circuit recognizes such a duty of disclosure in fiduciary or confidential relationships, and, outside of a fiduciary or confidential relationship, when a party voluntarily discloses some, but not all, material factors, or where the speaker fails to disclose new information that makes an earlier representation misleading or untrue. *In re Lau,* 2013 WL 5935616 (Bankr. E.D. Tex. 2013), at *19.

In Texas, to show fraud by nondisclosure, the creditor must prove "(1) a party conceals or fails to disclose a material fact within that party's knowledge, (2) the party had a duty to disclose the fact, (3) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (4) the party intends to induce the other party to take some action by concealing or failing to disclose the fact, (5) the other party justifiably relies on the nondisclosure, and (6) the other party suffers injury as a result of acting without knowledge of the

undisclosed fact." *In re Edelman,* No. 13-31182-BJH, Adv. 13-3126-BJH, 2014 WL 1796217, at *34 (Bankr. N.D. Tex, May 6, 2014), *citing Bradford v. Vento,* 48 S.W.3d 749, 755-56 (Tex. 2001). Plaintiff must prove these elements by a preponderance of the evidence. *Id.*

### b. Willful and Malicious Injury Under 11 U.S.C. § 523(a)(6)

Bankruptcy Code section 523(a)(6) provides that a discharge under section 727 of this title does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity. "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (Debt arising from a medical malpractice judgment, attributable to negligent or reckless conduct, is not a deliberate, intentional act under § 523(a)(6).) An injury is "willful and malicious" where there is either an objective substantial certainty of harm or a subjective motive to cause

harm. *Matter of Miller*, 156 F.3d 598, 606 (5th Cir.1998).

## IV. Collateral Estoppel or Claim Preclusion Issue

### a. Jury Charge, and Judgment allow alternative findings not permitted under state or federal law of collateral estoppel.

In 2011, Plaintiff sued Debtors, Max Rivas, Mexfil Services, Mexfil Family Of Services, Inc., and Mexfil Construction And Management Services, LLC, in state court, alleging Debtors defrauded both Plaintiff and the company, along with other allegations. *See No. 2011-16452, 113ᵗʰ Judicial District Court of Harris County, Texas*. A jury rendered a verdict in Plaintiff's favor against Debtors (Plaintiffs Exhibit 125). The trial court entered a final judgment against Debtors in the amounts of $766,213.00 in damages, $89,740.92 in prejudgment interest, $90,000.00 in exemplary damages, and $489,231.97 in attorney's fees. (Plaintiffs Exhibit 126).[12]

[13] The final judgment states only:

In consideration of the verdict of the jury, it is

---

[12]Additional amounts were determined for attorney's fees in the event of appeal. Also the judgment awarded Defendants $14,275.00 against Plaintiff.

[13]This Court reviewed and admitted the state trial record in this adversary proceeding.

Ordered that Plaintiff Marichu P. Pasagui shall have and recover from Defendants Rafael Perez and Patty Perez, jointly and severally, judgment for damages in the amount of $766,213.00. It is further

Ordered that Plaintiff Marichu P. Pasagui shall have and recover from Defendants Rafael Perez and Patty Perez, jointly and severally, judgment for prejudgment interest on the amount of damages awarded in the preceding paragraph in the additional amount of $89,740.92. It is further

Ordered that Plaintiff Marichu P. Pasagui shall have and recover from Defendants Rafael Perez and Patty Perez, jointly and severally, judgement for exemplary damages in the additional amount of $90,000.00.

...

(Plaintiff's Exhibit 126).

The state court charge to the jury defines fraud as:

Fraud occurs when-

1. A party makes a false misrepresentation, and
2. The misrepresentation is made with knowledge of its falsity *or made recklessly without any knowledge of the truth as a positive assertion* and
3. The misrepresentation is made with the intention that it should be acted on by the other party and
4. The other party relies on the misrepresentation and thereby suffers injury.

Fraud also occurs when-

       *1. A party has actual awareness of the falsity of a representation or promise made by another person and*
       *2. A party fails to disclose the falsity of the representation or promise to the person defrauded and*
       *3. Benefits from the false representation or promise.*

Fraud also occurs when-

       1. A party makes a false promise to do an act and
       2. The promise is material, and
       3. The promise is made to a person for the purpose of inducing the person to enter into a contract, and
       4. That person relies on the promise in entering that contract.

(emphasis added).

The jury answered "yes" to the following questions 1, 3, and 5 contained in the state court charge to the jury, and answered questions 2, 4, and 6 in dollar amounts of $81,257.00, $684,956.00, and $90,000.00, respectively:

Question 1

Did Rafael Perez and/or Patty Perez commit fraud against Marichu Pasagui concerning the "Agreement to Transfer and Option to Repurchase Shares of Mexfil Hotel & Building Services, Inc.? [Plaintiffs Exhibit 32]

Answer "yes" or "no" as to each of the following:

Rafael Perez, Answer:_____

Patty Perez, Answer:_____

If your answer to Question 1 is "Yes", then answer the following question. Otherwise do not answer the following question.

Question 2

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Marichu Pasagui for her actual damages, if any, that resulted from such fraud?

Do not add any amount for interest on damages, if any.
Answer in dollars and cents, if any.
Answer: _____

Question 3

Did Rafael Perez and/or Patty Perez commit fraud against Marichu Pasagui concerning the "Agreement to Transfer Shares of Mexfil Hotel & Building Services, Inc.? [Plaintiff's Exhibit 11]

Answer "yes" or "no" as to each of the following :

Rafael Perez, Answer: _____

Patty Perez, Answer: _____

If your answer to Question 3 is "Yes", then answer the following question. Otherwise do not answer the following question.

Question 4

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Marichu Pasagui for her actual damages, if any, that resulted from such fraud? Do not add any amount for interest on damages, if any. Answer in dollars and cents, if any.

Answer: _____

Answer the following question only if you unanimously answered "Yes" to Question 1 or Question 3. Otherwise, do not answer the following question. To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

Question 5

Do you find by clear and convincing evidence that the harm to Marichu Pasagui resulted from *malice and/or fraud?*

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction that of the truth of the allegations sought to be established.

*"Malice" means a specific intent by Rafael Perez and/or Patty*

*Perez to cause substantial injury or harm to Marichu Pasagui.*
Answer "Yes" or "No":

Answer: _____

Answer the following question only if you unanimously answered "Yes" to Question 5. Otherwise, do not answer the following question. You must unanimously agree on the amount of any award of exemplary damages.

Question 6

What sum of money, if any, if paid now in cash, should be assessed against Rafael Perez *and/or* Patty Perez and awarded to Marichu Pasagui as exemplary damages, if any, for the conduct found in response to Question 6? "Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are-
1. The nature of the wrong.
2. The character of the conduct involved.
3. The degree of culpability of Rafael Perez *and/or* Patty Perez.
4. The situation and sensibilities of the parties concerned.
5. The extent to which such conduct offends a public sense of justice and propriety.
6. The net worth of Rafael Perez and Patty Perez.
Answer in dollars and cents, if any.

(Plaintiff's Exhibit 125) *(emphasis added).*

### b. Collateral Estoppel Requires a Conclusive Judgment

In dischargeability proceedings, parties may invoke collateral estoppel in certain circumstances to bar relitigation of issues relevant to dischargeability, although the bankruptcy court retains jurisdiction to ultimately determine the dischargeability of the debt. *Grogan v. Garner*, 498 U.S. 279, 285, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Matter of Schwager,* 121 F.3d 177, 181 (5th Cir. 1997).

Under the Federal Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts must give a state court judgment the same preclusive effect as would courts of the state rendering the judgment. *McDonald v. West Branch Mich.*, 466 U.S. 284, 287-288 (1984). When the judgment is a Texas state court judgment, Texas rules of preclusion apply. *Matter of Schwager,* 121 F.3d at 181.

"Under Texas law, collateral estoppel bars relitigation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit, regardless of whether the second suit is based upon the same cause of

action." *Id.* "The elements of collateral estoppel under Texas law are: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Id.*

"Texas courts have adopted the Restatement (Second) of Judgments § 27, which is the general rule on issue preclusion." *Matter of Schwager*, 121 F.3d at 183. "If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." Restatement (Second) of Judgments § 27 comment i (1982).

The Texas Supreme Court in *Eagle Properties, Ltd. v Scharbauer*, 807 S.W.2d 714, 722 (Tex. 1990) explained "[t]he rationale for this rule is that a determination in the alternative may not have been as rigorously considered as it would have been if necessary to the result and the losing

party may be dissuaded from appealing one determination because of the likelihood that the other will be upheld."

### c. The Questions Regarding Fraud and Malice In The State Court Jury Charge Are Not Conclusive

The state court jury charge contains three alternative definitions of fraud. The first of the three includes, in addition to conduct marked by moral turpitude or intentional wrong, reckless conduct, defined as including conduct where the party does not have knowledge of the truth. The second definition includes the awareness of the falsity of a representation made by another person that is not disclosed, without regard to whether the party has a duty to disclose.[14] As addressed above, failure to disclose constitutes fraud only where there is a duty to disclose. The Court concludes that the state court jury's answers to Questions 1 and 3 are not entitled to preclusive effect as to the issue of fraud under Section 523(a)(2)(A) of the Bankruptcy Code.

Further, the jury charge states that "malice" means a "specific intent

---

[14]The third definition includes only conduct involving moral turpitude or intentional wrong.

Perez 20170302.wpd                    -35-

by Rafael Perez and/or Patty Perez to cause substantial injury or harm to Marichu Pasagui." The jury answer of "yes" does not specify which debtor is liable for exemplary damages.

Under Texas law, one spouse is not responsible for the debts of the other spouse. *See Tedder v. Gardner Aldrich, LLP*, 421 S.W.3d 651, 655 (Tex. 2013). Since there is no finding that either Rafael Perez and Patty Perez individually or jointly are liable for the tort debts of each other, collateral estoppel does not apply. *See Kawaauhau v. Geiger,* 523 U.S. 57, 60-61, 118 S. Ct. 947, 976, 140 L. Ed. 2d 90 (1998).

In sum, nondischargeability under §523(a)(2)(A) cannot be based on reckless conduct, as defined in the jury charge. Fraud by silence without proof of duty under the law cannot equate to fraud under §523(a)(2)(A). In addition, the findings of the state court jury fail to distinguish which debtor committed malice under § 523(a)(6). For these reasons, collateral estoppel does not preclude relitigation of Plaintiff's case against Debtors.

Perez 20170302.wpd

## V. Plaintiff failed to prove that Debtors committed fraud in either the first alleged fraudulent transfer or second alleged fraudulent transfer.

The creditor must prove by a preponderance of the evidence that the debt is nondischargeable. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The first transaction Plaintiff claims is fraudulent is the April 29, 2008 amendment to the Trusteed Buy-Sell Agreement. Iverson testified that he created the April 29, 2008 amendment to the agreement, in order to reflect the parties' treatment of Patty's deposits to the accounts of Mexfil Services as equity contributions. (Trial Tr., 9/9/2016, p. 14-15).

Plaintiff testified that Iverson came up with the mechanism in the April 29, 2008 amendment. She testified that she did not raise an issue with the amendment, and signed it. (Trial Tr., 9/8/2016, p. 89-90). Patty Perez also testified that Iverson created the mechanism used in the amendment. She testified that Debtors did not raise an issue with the amendment, and signed it. (Trial Tr., 9/8/2016, p. 136-137).

Perez 20170302.wpd

Plaintiff asserts that the April 29, 2008 transaction, by which Patty Perez purchased 271 shares of Plaintiff's stock, was a fraud. Plaintiff claims "Patty Perez falsely represented to Plaintiff, either directly or indirectly, that she contributed money and equipment to Mexfil totaling $243,771.00." (Docket No. 44).

Plaintiff's evidence does not support Plaintiff's claim. Plaintiff appears to have extrapolated the $243,771.00 figure by multiplying the contribution Patty Perez had made, totaling $81,257.00, by three, the number of shareholders. While that proposition is mathematically correct, it is not a correct statement of Debtors' representations. The evidence before the Court is that Mexfil Services continued to have financial difficulties, and Patty Perez continued to make deposits in order to cover its operating expenses. The transfer of shares from the other two shareholders is supported by consideration. The Court concludes that Plaintiff failed to bear her burden of proof of fraudulent intent as to the April 29, 2008 transaction.

The second fraud alleged by Plaintiff includes the July 22, 2008 shareholders' agreement, under which the shareholders agreed to transfer shares in lieu of cash contributions to Mexfil Services, combined with the September 11, 2008 transfer of Plaintiff's remaining 729 shares to Patty Perez, plus the amendment which extinguished Plaintiff's right to repurchase the 271 shares. These agreements were based on Patty Perez's previous contributions and anticipated contributions, totaling $218,700.

As a starting point, the stock transfer mechanism created by Iverson was wholly improper for a corporation. Under the Texas Business Organizations Code, shareholders in corporations incorporated before September 1, 2003 have preemptive rights to acquire unissued or treasury shares of the corporation. Tex. Bus. Org Code § 21.208. Mexfil/Mexfil Services, was incorporated in August, 2002. Consequently, the shareholders had preemptive rights.

Scott Barrett, an expert on corporations and other business organizations, testified that the Texas Business Organizations Code does not provide for transfer to from one shareholder of shares previously issued to

aanother shareholder, in order to achieve a specified fractional ownership of the corporation.  While the transfer mechanism Iverson used does exist for both limited liability companies and partnerships, it does not properly apply to a corporation such as Mexfil/Mexfil Services.  (Trial Tr., 9/9/2016, p. 56).

Notwithstanding that the  improper structure, Iverson prepared the documents for Plaintiff and Patty Perez. Both Plaintiff and Patty Perez relied on Iverson's assertions that the structure was correct.  Patty Perez testified that she signed the July 22, 2008 and September 11, 2008 documents in reliance on Iverson's recommendation. (Trial Tr., 9/8/2016, p. 51).  Plaintiff testified that Iverson made the decision that cash infusions into Mexfil Services would be addressed by transferring shares from one shareholder to another.  (Trial Tr., 9/8/2016, p. 141-142).

Because  fraudulent  intent  is  inferred  from  the  totality  of circumstances, reliance on advice of counsel may be considered as a factor in determining intent.  Where the debtor's reliance is reasonable and in good faith, the advice of counsel may negate the inference of fraudulent intent. *See In re Siddell*, 191 B.R. 544 (Bankr. N.D.N.Y. 1996).

It is clear that both Plaintiff and Patty Perez recognized that Mexfil Services had serious cash flow problems and that Patty Perez had to make frequent contributions to the corporate account to cover corporate expenditures. Mexfil Services needed to obtain a loan. Plaintiff's bad credit prevented the loan.

Both Plaintiff and Patty Perez knew Plaintiff could not remain a shareholder if the company were to obtain the loan. Both Plaintiff and Patty Perez relied on Iverson's transfer mechanism to accomplish this result. Iverson himself communicated separately with Plaintiff and Patty Perez before preparing the September 11, 2008 document. The Court concludes that Plaintiff failed to bear her burden of proof of fraudulent intent as to the July 22, 2008 and September 11, 2008 agreements.

## VI. **Plaintiff failed to prove a willful and malicious injury**

The uncontradicted testimony is that Mexfil Services sought a loan from Wells Fargo because of its financial distress. Both Plaintiff and Patty Perez were aware that Wells Fargo would not make the loan if Plaintiff was a shareholder of Mexfil Services. Plaintiff entered into the September 11, 2008 agreement knowing that it would divest her of her equity interest in

Mexfil Services.

Notwithstanding the September 11, 2008 agreement, the parties continued to operate as though Plaintiff owned shares of Mexfil Services.[15] Both parties accepted Iverson's proposed share transactions in good faith. The Court concludes that Plaintiff has failed to bear her burden to prove that Debtors willfully and maliciously injured her. The Court concludes that Debtors are entitled to discharge their debt to Plaintiff based on the state court judgment.

Signed this 13 day of March, 2017 at Houston, Texas.

KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE

---

[15]This Court does not decide whether Plaintiff presently owns shares of Mexfil Services.